FILED

2023 Mar-28  PM 02:49
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **JACOB LOWE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.** |
| | ) | **2:20-cv-01806-MHH** |
| **MARK PETTWAY,** *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

In this action, Jacob Lowe, a former deputy in the Jefferson County Sheriff's Office, asserts that the defendants fired him because he disclosed that he was suffering from combat-related nightmares and substance abuse and checked into a rehab facility for treatment. Mr. Lowe, who is Caucasian, contends that to the extent the defendants argue that he violated JCSO policy, African-American JCSO employees have violated policy without being terminated. The defendants, Sheriff Mark Pettway and Chief Deputy Willie Hill, have asked the Court to enter judgment in their favor on Mr. Lowe's claims against them for race and disability-based discrimination. Sheriff Pettway and Chief Deputy Hill argue that there were legitimate, non-discriminatory reasons for Mr. Lowe's termination.

This opinion resolves the defendants' motion for summary judgment. The opinion begins with a statement of the summary judgment standard. Applying that

standard, the Court then describes the evidence in the summary judgment record, presenting that evidence in the light most favorable to Mr. Lowe. Finally, the Court evaluates the evidence using the legal principles that govern Mr. Lowe's discrimination claims.

## I.

A district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). To demonstrate a genuine dispute of material fact that precludes summary judgment, the party opposing a motion for summary judgment must "go beyond the pleadings" and cite "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); FED. R. CIV. P. 56(c)(1)(A). "The court need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3).

"A litigant's self-serving statements based on personal knowledge or observation can defeat summary judgment." *United States v. Stein*, 881 F.3d 853, 857 (11th Cir. 2018); *see also Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253 (11th Cir. 2013) ("To be sure, Feliciano's sworn statements are self-serving,

but that alone does not permit us to disregard them at the summary judgment stage."). Even if a district court doubts the veracity of certain evidence, the court cannot make credibility determinations; that is the work of jurors. *Feliciano*, 707 F.3d at 1252 (citing *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986)); *see also Strickland v. Norfolk S. Ry. Co*., 692 F.3d 1151, 1162 (11th Cir. 2012).

When considering a motion for summary judgment, a district court must view the evidence in the record in the light most favorable to the non-moving party and draw reasonable inferences in the non-moving party's favor. *White v. Beltram Edge Tool Supply, Inc*., 789 F.3d 1188, 1191 (11th Cir. 2015) (citing *Scott v. Harris*, 550 U.S. 372, 378 (2007)). If the evidence in this case, viewed in the light most favorable to Mr. Lowe, creates a disputed question of material fact, then a jury will have to "resolve the parties' differing versions of the truth." *Anderson*, 477 U.S. at 249.

## II.

Mr. Lowe served in the Marine Corps from 2005 to 2013. (Doc. 30-1, p. 10, tpp. 32-33; Doc. 35-3, p. 2). Tragically, in 2008, 23 of Mr. Lowe's close friends in the military were critically injured. One friend died "right in front of [him]." (Doc. 30-1, p. 10, tp. 33). Mr. Lowe developed PTSD that went undiagnosed for several years. (Doc. 30-1, pp. 10-11, tpp. 33-35).

When Mr. Lowe left the Marines in 2013, he became a deputy in the Jefferson County Sheriff's Office. (Doc. 30-1, p. 6, tpp. 15-16). The JCSO gave Mr. Lowe a

policy and procedure manual that included, among other things, policies on punctuality and absences, information about an Employee Assistance Program concerning substance abuse, and an Equal Employment Opportunity policy. (Doc. 30-1, p. 6, tp. 16; Doc. 30-3, pp. 3-5, ¶¶ 3, 5, 7, 8 and pp. 9-11, 27-30, 32).

Mr. Lowe was a productive deputy for the JCSO, receiving commendations for his work, (Doc. 35-6, p. 257, tpp. 1014-17), but he struggled with attendance. Twice during training, Mr. Lowe was absent from the academy without leave. The second of these incidents occurred on July 28, 2014 and resulted in a one-day suspension. (Doc. 30-3, pp. 36-38). After he graduated from the academy, Mr. Lowe was assigned to the JCSO Corrections Division at the county jail. On December 7, 2015, Mr. Lowe received a three-day suspension for excessive tardiness between April 2015 and December 2015. (Doc. 30-3, pp. 39-44).

In 2016, Mr. Lowe moved from the Corrections Division to the Patrol Division. (Doc. 30-1, p. 9, tp. 26). In 2017, Mr. Lowe failed to submit several warrants within the required timeframe. (Doc. 30-3, pp. 52-53). In 2018, Mr. Lowe began to struggle again with tardiness. By December 2018, Internal Affairs had opened an investigation concerning Mr. Lowe. (Doc. 30-3, p. 47). On December 28, 2018, Mr. Lowe asked to transfer from the Patrol Division to the Corrections Division. (Doc. 30-3, p. 48). The evidence shows that Mr. Lowe was having nightmares that interfered with his sleep, and he was drinking too much off-duty, but

he had not sought treatment.

On January 4, 2019, Mr. Lowe did not report for work. Lieutenant Mayes contacted Mr. Lowe, and Mr. Lowe indicated that he was on his way to the station. When Mr. Lowe arrived, Lieutenant Mayes informed Mr. Lowe that his police vehicle was being taken from him. Lieutenant Mayes had Sergeant Park drive Mr. Lowe home. (Doc. 30-3, p. 45). The officer who inspected Mr. Lowe's police vehicle reported that Mr. Lowe had not maintained the unit properly. On January 9, 2019, Lieutenant Mayes recommended to Captain John Verbitski that Mr. Lowe be suspended for five working days for his violation of the JCSO policy concerning vehicle maintenance. (Doc. 30-3, pp. 45-46).

In a memo dated January 10, 2019, Lieutenant Russell Starnes indicated that Mr. Lowe was late for work or absent without leave seven times between December 3, 2018 and January 4, 2019, that Mr. Lowe frequently called and reported that he was sick though "he had no accumulated time left to use," that Mr. Lowe did not follow orders, and that Mr. Lowe failed to submit reports on time, creating "awkward and embarrassing situations for Supervisors and Deputies who have had to make excuse[s] for him when facing citizens who come to pick up their reports." (Doc. 30-3, pp. 47-50). Lieutenant Starnes recommended that the JCSO terminate Mr. Lowe's employment. (Doc. 30-33, p. 49).

That same day, Mr. Lowe transferred from Patrol to Corrections. (Doc. 30-4,

p. 3, ¶ 6).   Within his first month at the jail, Mr. Lowe received performance

counseling three times for late arrivals for work.  (Doc. 30-3, p. 55; Doc. 30-4, pp.

11-16).  Mr. Lowe reported to Sergeant Terry Scott and Sergeant McReelis that he

was having trouble sleeping because of nightmares.  (Doc. 30-1, p. 11, tp. 37).

Sergeant Scott was Mr. Lowe's immediate supervisor.  (Doc. 30-1, p. 13, tp. 45).

Mr. Lowe visited the VA and was diagnosed with PTSD.  (Doc. 30-1, p. 11, tpp. 35-

37).  He began seeing a psychiatrist, and he was prescribed a daily medication.  (Doc.

30-1, pp. 13-14, tpp. 45-46).[1]

On January 27, 2019, Sergeant Scott wrote a memo to Mr. Lowe's

commanding officer, Lieutenant Guntharp, explaining:

> I have talked with Dep. Lowe several times about his tardiness and
> absences.  Dep. Lowe has stated that he has trouble sleeping at night
> because of nightmares related to his time in the military.  Dep. Lowe
> has requested in the past to be assigned to nightshift, Dep. Lowe
> explained it is easier for him to sleep during the daytime hours.
>
> I recommend reassigning Dep. Lowe to nightshift not only as a way to
> ensure he is able to gain the sleep he needs but to also ensure the safety
> of those assigned to work with him as he should be well rested and not
> sleep deprived.

(Doc. 30-4, pp. 10, 19).   Sergeant Scott helped Mr. Lowe write a memo to Lt.

---

[1] According to Lt. Guntharp, at some point in January 2019, he reported to Captain Thompson that
Mr. Lowe was having trouble showing up for work.  Captain Thompson called Mr. Lowe in to
meet with him and Lt. Guntharp.  Lt. Guntharp stated that he thought Mr. Lowe was upset and
nervous, but he did not understand that Mr. Lowe had a problem.  According to Lt. Guntharp, Mr.
Lowe denied that he had a problem, and he (Lt. Guntharp) was not familiar with the symptoms of
PTSD.  (Doc. 35-6, pp. 93-94, tpp. 360-62).

Guntharp about the treatment Mr. Lowe was seeking for sleep issues stemming from "incidents [he] experienced during [his] service in the military."  (Doc. 30-1, p. 12, tpp. 40-41).  On January 29, 2019, Mr. Lowe wrote:

> I served as a Marine Corps Infrantryman from 2005-2013.  Because of events that transpired during this time-frame, I currently have difficulty sleeping at night.  After leaving the Marine Corps, I coped with this issue by having my spouse wake me in the mornings.  She is currently unavailable, and the resulting consequences have created an unhealthy environment for my family.  My ability to arrive to work on time has diminished due to these circumstances.  I request that I be transferred to a later shift for the time being until I can receive the proper medical solution.  In the past several months, I have scheduled appointments with the V.A. Hospital, and have conveyed this information to a mental health professional, and I'm actively pursuing the help that is available to me in order to correct this problem.

(Doc. 35-3, p. 2).[2]

Effective February 2, 2019, Lt. Guntharp moved Mr. Lowe to the evening shift from 2:00 p.m. to 10:00 p.m.  (Doc. 35-2, p. 3; *see also* Doc. 35-1, p. 2).  Lt. Guntharp coupled his decision to move Mr. Lowe to the evening shift with a recommendation to Captain David Thompson of a three-day suspension without pay for Mr. Lowe based on Mr. Lowe's performance counseling in January 2019.  (Doc. 35-2, p. 3).  In a memo to Captain Thompson dated February 1, 2019, Lt. Guntharp wrote:

> It is quite apparent that Deputy Lowe does not understand the

---

[2] Mr. Lowe mistakenly dated the memo January 29, 2018; the correct date is January 29, 2019. Mr. Lowe's wife no longer was available to wake him in the mornings because she and Mr. Lowe were having marital problems that led to a divorce in 2020.  (Doc. 30-1, pp. 5, 10, tpp. 12, 32; *see also* Doc. 35-6, p. 249, tp. 985).

importance of following rules and regulations and sterner measures should be taken. I request that Deputy Lowe be sent for a drug urinalysis test when he shows up for work. I would like to recommend that Deputy Lowe be required to either contact Employee Assistance for counseling or provide proof of counseling from the Veteran's Hospital. I further recommend that Deputy Lowe receive three (3) days suspension without pay. Deputy Lowe is being transferred effective 02 February 2019, Saturday to evening shift in an attempt to aid his work performance.

(Doc. 35-2, p. 3).[3] Lt. Guntharp did not mention the information that he received from Sgt. Scott and Mr. Lowe concerning Mr. Lowe's sleep issues.

On February 4, 2019, Captain Thompson conveyed to Chief Deputy Hill Lt. Guntharp's recommendation for a three-day suspension and indicated that Mr. Lowe's conduct "may merit a more serious form of discipline." (Doc. 30-3, p. 55). Captain Thompson recommended that the JCSO refer Mr. Lowe's personnel file to Internal Affairs. (Doc. 30-3, p. 55). The day after Chief Deputy Hill received this recommendation from Captain Thompson in Corrections, Captain Verbitski from Patrol recommended to Chief Deputy Hill that JCSO terminate Mr. Lowe based on Sgt. Starnes "detailed investigation into Deputy Lowes' [*sic*] failures." (Doc. 30-3, p. 56). There is no evidence that Chief Deputy Hill acted on either recommendation.

Two weeks later, on February 18, 2019, Mr. Lowe called Lt. Guntharp at home at 8:00 p.m. to report that he had a substance abuse issue that was affecting

---

[3] Despite Lt. Guntharp's recommendation to Captain Thompson that JCSO obtain proof of Mr. Lowe's counseling from the VA, Lt. Guntharp testified at an August 9, 2019 Personnel Board hearing that Mr. Lowe never reported to him that he had a problem. (Doc. 35-6, p. 95, tp. 366).

his work and that he needed help.  (Doc. 30-1, p. 15, tp. 51; *see* Doc. 35-6, p. 65, tpp. 246-47).[4]  Lt. Guntharp recommended that Mr. Lowe contact Employee Assistance.  (Doc. 35-6, pp. 65, 96, 249, tpp. 246-47, 371-73, 984-85).  Lt. Guntharp testified that Mr. Lowe's call was the first time that an officer had called him at home to ask for help.  Still, Lt. Guntharp simply assumed that Mr. Lowe contacted Employee Assistance; he did nothing to follow up to see if Mr. Lowe was okay.  (Doc. 35-6, p. 96).  Lt. Guntharp stated that he did not speak with Mr. Lowe after he called the night of February 18 because he had "[o]ther duties" and was "[b]usy with other things."  (Doc. 35-6, p. 96, tp. 373).

On February 19, 2019, Mr. Lowe called Employee Assistance or EAP and reported that he had a substance abuse problem.  (Doc. 30-1, p. 15, tp. 52).  EAP scheduled a meeting with Mr. Lowe on February 22.  (Doc. 30-1, pp. 15-16, tpp. 53-54).

Mr. Lowe was absent from work on February 20 and 21, 2019.  On February 20, he informed the booking deputy at the jail that he was sick, (Doc. 35-6, p. 243,

---

[4] Lt. Guntharp testified that he supervised Mr. Lowe for a little more than one month.  (Doc. 35-6, p. 80, tp. 306).  During the August 9, 2019 Personnel Board hearing, initially, Lt. Guntharp stated that the only time Mr. Lowe spoke to him about his substance abuse was sometime after April 1, 2019 when Mr. Lowe called to tell him that he had just left rehab.  (Doc. 35-6, p. 81, tp. 310).  Eventually, on cross-examination, Lt. Guntharp testified that Mr. Lowe called him one evening to ask for the number for Employee Assistance, but he did not have the number.  (Doc. 35-6, p. 95, tpp. 366-67).  After reviewing a screenshot from his telephone which shows that Mr. Lowe called at 8:01 p.m. on February 18, 2019 and spoke to him for nearly four minutes, (Doc. 35-6, pp. 6, 95, tpp. 10, 367-69, 371), Lt. Guntharp acknowledged that Mr. Lowe "apparently" talked to him about going to rehab on February 18, 2019, (Doc. 35-6, pp. 95-96, tpp. 369-70).

tpp. 958-59), but Mr. Lowe did not contact his supervisor and did not answer his phone or return messages his supervisor left for him.  On February 21, Mr. Lowe called in sick, but he had exhausted his sick leave and vacation time.  (Doc. 30-4, pp. 21-22).

On February 21, 2019, Lt. Guntharp sent a memo to Captain Thompson in which he explained that he had transferred Mr. Lowe to evening shift because Mr. Lowe reported "difficulty sleeping due to his military experience many years ago" which made it difficult for Mr. Lowe to "wak[e] up in the mornings to report to work."  (Doc. 35-1, p. 2).  Lt. Guntharp stated that, despite the transfer, Mr. Lowe had not reported to work on February 20 or 21.  (Doc. 35-1, p. 2).  Lt. Guntharp recommended a three-day suspension without pay and a "fitness for duty examination (mental)."  (Doc. 35-1, p. 3).

On Friday, February 22, 2019, Mr. Lowe reported to work two hours late because he went to his EAP appointment.  Mr. Lowe notified Sergeant Posey that he was meeting with EAP.  When Mr. Lowe arrived at work, he explained to Sergeant Posey that he had another meeting with EAP on February 25, 2019.  Sergeant Posey authorized Mr. Lowe to attend the EAP meeting on February 25, 2019.  (Doc. 30-4, p. 4, ¶ 13; Doc. 35-6, pp. 65, 67, tpp. 248-49, 254-56).[5]

---

[5] At his administrative hearing, Mr. Lowe stated, "I told my supervisor, hey, I'm at employee assistance.  That was Sergeant Posey at the time." (Doc. 35-6, p. 65, tp. 248).  Mr. Lowe later had the following exchange with JCSO's attorney:

On February 25, 2019, Captain Thompson concurred with Lt. Guntharp's recommendation for a three-day suspension without pay and a mental fitness for duty examination for Mr. Lowe. (Doc. 35-1, p. 2). That same day, Mr. Lowe attended his appointment with EAP. A doctor at EAP referred Mr. Lowe to Bradford for substance abuse treatment, and Mr. Lowe reported directly to Bradford. (Doc. 35-6, pp. 64, 247-48, tpp. 244, 975-76, 979). During the trip from EAP to Bradford, Mr. Lowe attempted to call the jail to report that he was entering treatment, but he could not get through. (Doc. 30-1, p. 16, tpp. 54-55; Doc 35-6, pp. 64, 247-48, tpp. 244, 977-79).[6] When he arrived at Bradford, he had to surrender his phone and

---

Q. And with regard to notifying your supervisors, you are responsible, right?
A. Right.
Q. And you didn't notify them?
A. I notified them – I self-reported. About a month prior, I self-reported to my lieutenant. My lieutenant directed me to employee assistance. Before I went to employee assistance, I notified my immediate supervisor. When they reschedule[d] me for the following Monday, I notified him that I would have an appointment again on the Monday. All of these things are in accordance with the chain of command.
Q. Just so – just so – just so that we're clear, your notification was to Sergeant Posey that you had an appointment with employee assistance, correct?
A. And Lieutenant Guntharp who referred me.

(Doc. 35-6, p. 70, tpp. 266-67; *see also* Doc. 35-6, p. 259, tp. 1022).

[6] At his administrative hearing, Mr. Lowe testified:

Q. All right. Did you tell him [Sgt. Posey] anything else?
A. I went to – I went – to my appointment. I attempted. I attempted to. And from employee assistance to Bradford it could not get through to anybody, but I did call.
Q. Did you tell Lieutenant Guntharp that you would not be in to work?
A. That's – my previous answer covers that, too.

(Doc. 35-6, p. 68, tpp. 258-59; *see also* Doc. 35-6, p. 259, tp. 1022). At another point, JCSO's attorney asked Mr. Lowe "Did you notify Lieutenant Guntharp that you were going into Bradford

personal belongings, so Mr. Lowe asked his wife to inform the jail of his treatment. (Doc. 35-6, p. 64, tp. 244). Mr. Lowe's wife made several calls to the jail and left several messages; she also called the county's HR department. Mr. Lowe informed Bradford that he needed to notify his department, and the individual to whom he spoke indicated that Bradford would notify Mr. Lowe's HR department. Mr. Lowe witnessed a Bradford employee attempt to call JCSO's HR department twice and leave voicemails. (Doc. 30-1, p. 22, tpp. 79-80; Doc. 35-6, p. 260, tp. 1027).

Mr. Lowe received treatment at Bradford in a program tailored to law enforcement and former military officers. (Doc. 30-1, p. 16, tpp. 54-56; Doc. 35-6, pp. 64, 66, 68, 247-48, 250-51, 260, tpp. 243-44, 250, 258-59, 261-62, 976-79, 987-90, 1027). Bradford discharged Mr. Lowe on March 8, 2019. (Doc. 35-6, pp. 247-48, tpp. 981-83). Following his inpatient treatment, Mr. Lowe completed an intensive outpatient treatment plan through Bradford. (Doc. 30-1, p. 16, tpp. 56-57; Doc. 35-6, p. 249, tp. 982).

While Mr. Lowe was receiving inpatient treatment at Bradford, on March 4, 2019, Internal Affairs Deputy Herman Webb and Deputy Kyomi Wilson went to Mr. Lowe's residence "to conduct a welfare check and to serve [Mr. Lowe] with [a] Disciplinary Action of Termination." (Doc. 30-4, pp. 24). When no one answered

---

on the 25th?" Mr. Lowe answered "I notified lieutenant – well, no." The attorney asked: "You didn't?"; Mr. Lowe answered, "Right." (Doc. 35-6, p. 258, tp. 1021).

at Mr. Lowe's house, the officers called Ms. Lowe.  Ms. Lowe told Deputy Webb that Mr. Lowe had "gone through [the] Employee Assistance Program and had been referred to Bradford on February 25, 2019."  (Doc. 30-4, p. 24).  The Notice of Contemplated Disciplinary Action signed by Chief Deputy Hill states that Mr. Lowe had been "written up" for policy violations five times since his transfer on January 10 to Corrections and had been AWOL since February 20.  (Doc. 30-4, pp. 25-26). Chief Deputy Hill recommended Mr. Lowe's termination; Chief Deputy Hill copied Sheriff Pettway on the notice.  (Doc. 30-4, p. 26).  The notice did not provide information about steps Mr. Lowe could take to challenge the recommended termination.  (Doc. 35-6, p. 252, tpp. 994-95).[7]  The JCSO regarded Mr. Lowe as terminated.  (Doc. 35-6, p. 31, tp. 113).

When Mr. Lowe was released from Bradford, he met with an attorney, and the attorney contacted the JCSO about the termination notice.  On April 1, 2019, Mr. Lowe and his attorney had a meeting scheduled in an administrative building with two attorneys for the JCSO, Mr. Biggers and Mr. Hendrix.  (Doc. 35-6, p. 31, tp. 110).  Deputy Webb was present; so was Sheriff Pettway.  Before Mr. Biggers became aware that Mr. Lowe and his attorney were in the meeting room, Mr. Biggers

---

[7] In December of 2018, while Mike Hale was the Sheriff of Jefferson County, Mr. Lowe received a Notice of Contemplated Disciplinary action in which then-Chief Deputy Christian advised Mr. Lowe that he had recommended that the JCSO suspend Mr. Lowe for five days without pay.  The notice states that Mr. Lowe had the right to appeal the recommendation within 10 days.  (Doc. 30-2, pp. 16-17).

asked Deputy Webb "what race Mr. Lowe was." (Doc. 35-6, p. 31, tp. 111). Mr. Lowe's attorney announced his presence, and Mr. Biggers asked Mr. Lowe and his attorney to leave the room; the meeting was cancelled. (Doc. 30-1, p. 21, tp. 77; Doc. 35-7, p. 5, tpp. 14-15).

Mr. Biggers determined that Mr. Lowe had to have an opportunity for a hearing, so on April 3, 2019, the JCSO placed Mr. Lowe on administrative leave, without pay. At some point, his status changed to leave with pay. (Doc. 35-6, pp. 31-32, 252, tpp. 112-15, 995-96).

On April 10, 2019, JCSO sent Mr. Lowe a second Notice of Contemplated Disciplinary Action. The second notice contained the same recommendation for termination that appeared in the March 4, 2019 notice and included several new paragraphs describing reprimands and a performance counseling that Mr. Lowe received between 2016-2018. (Doc. 35-5, pp. 3-4). The second notice informed Mr. Lowe that a hearing on his proposed termination would be held on April 12, 2019. (Doc. 35-5, pp. 2, 5). Between April 3 and April 12, the JCSO did nothing to investigate the circumstances surrounding Mr. Lowe's treatment at Bradford. (Doc. 35-6, p. 32, tpp. 115-16).

The April 12 hearing resulted in Mr. Lowe's termination. (Doc. 30-2, pp. 29-30). The Personnel Board of Jefferson County conducted an evidentiary hearing to

review Mr. Lowe's termination and concluded that there was sufficient evidence to support JCSO's decision to terminate Mr. Lowe.  (Doc. 30-5, p. 3, ¶ 6; Doc. 35-6).

Mr. Lowe filed a charge of discrimination with the EEOC.  In it, Mr. Lowe asserted that the JCSO had discriminated against him based on his race and his disability, and he asserted that the JCSO had retaliated against him.  (Doc. 1-1, pp. 2-3).  After he received a right to sue letter, (Doc. 1-2), he filed this lawsuit against Sheriff Pettway and Chief Deputy Hill, (Doc. 1).

## III.

As a preliminary matter, the Court notes that in his complaint, Mr. Lowe seeks damages and equitable relief for discrimination and retaliation that he allegedly suffered as an employee of the Jefferson County Sheriff's Office.  (Doc. 1, pp. 1, 20).  Mr. Lowe asserts claims against Sheriff Pettway individually and in his official capacity as Sheriff of Jefferson County.  (Doc. 1, pp. 1, 2).  In his EEOC charge, Mr. Lowe named as his employer:  "Jefferson County Sheriff's Office (Mark Pettway, Official Capacity).  (Doc. 1-1, p. 2; *see also* Doc. 101, p. 6).  In his complaint, Mr. Lowe characterizes Sheriff Pettway as the person "through" whom the JCSO carried out "unlawful employment practices and acts of intentional discrimination."  (Doc. 1, p. 2, ¶ 7).  Mr. Lowe identifies Chief Deputy Hill as a defendant in his individual

capacity in the caption of his complaint but does not include Chief Deputy Hill in the "PARTIES" section of his complaint.  (Doc. 1, pp. 1, 2).

It does not appear that Mr. Lowe included Chief Deputy Hill as a defendant in the four counts in his complaint.  (Doc. 1, pp. 8-19).  To the extent that Mr. Lowe attempts to pursue an individual capacity claim against Chief Deputy Hill, the claim fails as a matter of law because claims under Title VII and the ADA lie against an employer, "not individual employees whose actions would constitute a violation of the Act."  *Hinson v. Clinch County, Georgia Bd. of Educ.*, 231 F.3d 821, 827 (11th Cir. 2000) (quoting *Busby v. City of Orlando*, 931 F.2d 764, 772 (11th Cir. 1991)); *Mason v. Stallings*, 82 F.3d 1007, 1009 (11th Cir. 1996).  Therefore, the Court will enter judgment in favor of Chief Deputy Hill on Mr. Lowe's claims against him.  Likewise, the Court will enter judgment in favor of Sheriff Pettway to the extent that Mr. Lowe attempts to pursue claims against him in his individual capacity.  Like the defendants, the Court understands that Mr. Lowe seeks relief from Mr. Pettway in his official capacity as the Sheriff of Jefferson County, Alabama.

### Race Discrimination Claims

Under Title VII of the Civil Rights Act of 1964, an employer may not "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a).  A plaintiff typically relies

on direct or circumstantial evidence of discriminatory intent to establish a claim for race discrimination under Title VII.

Direct evidence is '"evidence, which if believed, proves [the] existence of [a] fact without inference or presumption." *Kilpatrick v. Tyson Foods, Inc.*, 268 Fed. Appx. 860, 861-62 (11th Cir. 2008) (quoting *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1086 (11th Cir. 2004)).  Practically speaking, in direct evidence cases, a factfinder ordinarily will have "to make at least one inference" to conclude that "direct evidence" establishes, more probably than not, that the defendant impermissibly discriminated against the plaintiff. *Wright v. Southland Corp.*, 187 F.3d 1287, 1295, 1300 (11th Cir. 1999).  Otherwise, "the only direct evidence of illegal discrimination," if no inference were permitted, "would be testimony from the decisionmaker that he took an adverse employment action against the plaintiff on the basis of a protected personal characteristic." *Wright*, 187 F.3d at 1295.  Still, direct evidence typically consists of "blatant remarks, whose intent could be nothing other than to discriminate on the basis of a protected classification[.]" *Kilpatrick*, 268 Fed. Appx. at 862 (citing *Wilson*, 376 F.3d at 1086).

Mr. Lowe cites as direct evidence of race discrimination the exchange that occurred between a JCSO attorney and Deputy Webb as several people, including Mr. Lowe, his attorney, and Sheriff Pettway, were gathering on April 1, 2019 to discuss the first termination notice that the JCSO sent Mr. Lowe.  The attorney asked

17

Deputy Webb "what race Mr. Lowe was." (Doc. 35-6, p. 31, tp. 111; Doc. 35-7, p. 5, tp. 14). When Mr. Lowe's attorney announced his presence, the meeting with Sheriff Pettway abruptly ended. (Doc. 30-1, p. 21, tp. 77; Doc. 35-6, pp. 30-31, tpp. 108-11; Doc. 35-7, p. 5, tpp. 14-15).

For this exchange to constitute direct evidence, it must "demonstrate[] the state of mind of the employer (or, more concretely, the decisionmaker) at the time of the employment decision." *Wright*, 187 F.3d at 1294-95. Though the Sheriff's attorneys may have been involved in the decision to issue Mr. Lowe's first notice of termination on March 4, 2019, (Doc. 30-4, pp. 25-26), the attorney's question several weeks after the JCSO memorialized its termination decision in a notice to Mr. Lowe is not direct evidence of the decisionmaker's state of mind at the time of the employment decision. *Wright*, 187 F.3d at 1295 n.9. In fact, the question suggests that, to the extent the attorney was involved in the decision, he did not know Mr. Lowe's race at the initial time of the decision.

Ultimately, the JCSO did not terminate Mr. Lowe until 12 days after the exchange between the Sheriff's attorney and Deputy Webb. (Doc. 30-2, pp. 29-30). Therefore, the April 1 inquiry into Mr. Lowe's race may be circumstantial evidence of discriminatory intent, but it is not direct evidence. Courts assess circumstantial evidence of an employer's discriminatory intent using a burden-shifting framework: a plaintiff must present a prima facie case of discrimination; if the plaintiff does so,

the defendant must articulate a legitimate, non-discriminatory reason for its adverse employment action; and, if the employer carries its burden, then the plaintiff must demonstrate that the employer's articulated reason is pretext for discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-804 (1973).

Under the *McDonnell Douglas* framework, a plaintiff's prima facie case consists of evidence showing that he "belongs to a protected class," "was subjected to an adverse employment action," "was qualified to perform the job in question," and was treated less favorably than similarly situated employees outside his class. *Lewis v. City of Union City, Georgia*, 918 F.3d 1213, 1220-21 (11th Cir. 2019) (*en banc*).  To demonstrate that an employee outside of the plaintiff's protected class is "similarly situated in all material respects," a plaintiff may offer proof that his co-employee:

- "engaged in the same basic conduct (or misconduct)" as him;

- was "subject to the same employment policy, guideline, or rule as him;

- was "under the jurisdiction of the same supervisor" as him; and

- had a similar "employment or disciplinary history."

*Lewis*, 918 F.3d at 1227-28 (internal citations omitted).

In his summary judgment brief, Mr. Lowe identified as comparators two co-employees who are Black, but neither is similarly situated to him in all material respects, so if Sheriff Pettway treated either deputy more favorably than Mr. Lowe,

the comparison is not probative of discriminatory intent.  One of the deputies allegedly was "under investigation for illegally obtaining warrants against his girlfriend's ex-boyfriend," and the other allegedly "ran from the Birmingham Police after a street racing incident and subsequently issued citations by BPD."  (Doc. 35-7, p. 7, tpp. 22-23).  Because Mr. Lowe has not satisfied the fourth element of his prima facie case, he cannot establish discriminatory intent using the *McDonnell Douglas* framework.[8]

Of course, "the *McDonnell Douglas* framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case."  *Smith v. Lockheed-Martin Corp.*,

---

[8] In his deposition, Mr. Lowe identified several other Black co-employees he believes have been involved in "similar incidents" who were not reprimanded, including an employee who "was consistently 15 to 30 minutes late for his shift at the jail." (Doc. 30-1, p. 18, tpp. 62-65).  But Mr. Lowe did not mention these employees in his summary judgment brief, so he appears to have abandoned comparator arguments with respect to these employees. *Johnson v. Board of Regents of Uni. of Ga.*, 263 F.3d 1234, 1264 (11th Cir. 2001) (stating that a party "cannot readily complain about the entry of a summary judgment order that did not consider an argument they chose not to develop for the district court at the time of the summary judgment motions").  In his deposition, Sheriff Pettway acknowledged that several of Mr. Lowe's co-employees engaged in serious misconduct but were not terminated.  During a shift, one deputy got into a physical fight with another deputy, but neither was fired.  Another deputy was investigated by Internal Affairs for an alcohol-related incident that involved a firearm.  He was disciplined, but he was not terminated. Another deputy was arrested for violent threats against his wife who also is a deputy.  The JCSO investigated the alleged offenses but did not terminate the deputy.  Another deputy was suspended for stealing televisions from the JCSO property room, but he was not terminated.  (Doc. 35-7, pp. 6, 8-9, tpp. 20-21, 26-30).  Sheriff Pettway was not familiar with other reported incidents that took place before he became sheriff on January 14, 2019, including a deputy who was using heroin and went to rehab.  (Doc. 30-4, p. 3, ¶ 2; Doc. 35-7, pp. 6-9, tpp. 19-30).  None of this evidence is helpful to Mr. Lowe with respect to his Title VII claim because the record does not disclose the race of the deputies, and most of the conduct described is not sufficiently similar to the conduct which the JCSO identified as the basis for Mr. Lowe's termination.

644 F.3d 1321, 1328 (11th Cir. 2011); *Lewis*, 918 F.3d at 1220 n.6.  Therefore, a

plaintiff's "failure to produce a comparator does not necessarily doom the plaintiff's

case.  Rather, the plaintiff will always survive summary judgment if he presents

circumstantial evidence that creates a triable issue concerning the employer's

discriminatory intent." *Lockheed-Martin Corp.*, 644 F.3d at 1328.  "[N]o matter its

form, so long as the circumstantial evidence raises a reasonable inference that the

employer discriminated against the plaintiff, summary judgment is improper."

*Lockheed-Martin Corp.*, 644 F.3d at 1328; *see also Rioux v. City of Atlanta*, 520

F.3d 1269, 1281 (11th Cir. 2011).

 Setting aside comparators, Mr. Lowe argues accurately that Captain

Buchanon testified that Sherriff Pettway has not terminated a Black deputy for being

AWOL.  (Doc. 35, p. 9) (citing Doc. 35-6, p. 50, tp. 189).  When asked if JCSO

employees have been AWOL or late, Captain Buchanon responded:  "I imagine they

are," but he said "[i]t may be that" no Black employee had reached the point under

the JCSO's progressive discipline policy that the employee had been terminated.

(Doc. 35-6, pp. 50-51, tpp. 189-91).  The Court has not found evidence in the record

that builds on Captain Buchanon's testimony and establishes that JCSO allowed

Black deputies to be late or AWOL without imposing discipline at all or that the

JCSO gave Black deputies more chances to improve or fewer write-ups than Mr.

Lowe.  Captain Buchanon's testimony, even when coupled with the JCSO's

attorney's question about Mr. Lowe's race, is not adequate to support a reasonable inference that race motivated the JCSO's decision to terminate Mr. Lowe. Therefore, the Court will enter judgment for Sheriff Pettway in his official capacity on Mr. Lowe's Title VII race discrimination claim.[9]

The Court cannot tell whether, in addition to his Title VII race discrimination claim, Mr. Lowe intended to assert a race discrimination claim against Sheriff Pettway under 42 U.S.C. § 1981.  The language of Mr. Lowe's complaint focuses on Title VII, but Mr. Lowe included § 1981 in the heading of his race discrimination count.  (Doc. 1, p. 8).  If Mr. Lowe did intend to assert a § 1981 race discrimination claim against Sheriff Pettway, the claim fails for the reasons that his Title VII race discrimination claim fails.  *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998) (stating that Title VII and § 1981 "have the same requirements of proof and use the same analytical framework"); *see also Jackson v. United Parcel Service, Inc.*, 593 Fed. Appx. 871, 876 (11th Cir. 2014) ("Jackson's failure to survive summary judgment under Title VII is also fatal to her § 1981 claim, and the district court properly dismissed this claim.").  Therefore, the Court will enter judgment for Sheriff Pettway in his official capacity on Mr. Lowe's § 1981 race discrimination claim.

---

[9] Mr. Lowe did not assert a Title VII mixed motive claim, so the Court will not consider whether race was a motivating factor in the JCSO's decision to terminate Mr. Lowe.

## ADA Discrimination Claim

Mr. Lowe contends that the JCSO refused to accommodate his "known physical and[/]or mental limitations" and discriminated against him in the terms and conditions of his employment in violation of the Americans with Disabilities Act. (Doc. 1, p. 14, ¶¶ 94-99). Under the ADA, an employer may not discriminate against "a qualified individual on the basis of disability in regard to . . . discharge of employees . . . and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). "[T]he term 'discriminate against a qualified individual on the basis of disability' includes . . . not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5)(A).

For ADA discrimination claims as for Title VII discrimination claims, a plaintiff may rely on direct or circumstantial evidence. In the case of circumstantial evidence, the *McDonnell Douglas* burden-shifting framework applies as does the *Lockheed-Martin Corp.* test. *Holly v. Clairson Industries, L.L.C.*, 492 F.3d 1247, 1255 (11th Cir. 2007); *Lewis*, 918 F.3d at 1220-21 n.6, n.7. To establish a *prima facie* case of discrimination based on disability under the *McDonnell Douglas* framework, a plaintiff must show that "(1) []he is disabled, (2) []he was a 'qualified

individual' when []he was terminated, and (3) []he was discriminated against on account of [his] disability." *Holly*, 492 F.3d at 1255-56.  Sheriff Pettway contends that Mr. Lowe cannot establish that he has an ADA disability, that he identified a reasonable accommodation that JCSO refused to provide, or that JCSO's stated reason for his termination is pretext for discrimination.[10]

### Disability

For purposes of an ADA discrimination claim, disability "is defined as a physical or mental impairment that substantially limits one or more major life activities of an individual; a record of such an impairment; or being regarded as having such an impairment."  *United States Equal Employment Opportunity Comm'n v. St. Joseph's Hospital, Inc.*, 842 F.3d 1333, 1343–44 (11th Cir. 2016) (quoting 42 U.S.C. § 12101(1) (internal quotations omitted)).  "To prove a 'regarded as' disabled claim, [a plaintiff] must 'establish[] that he has been subjected to an action prohibited under [the ADA] because of an actual or perceived physical or mental impairment . . . .'"  *Snider v. U.S. Steel-Fairfield Works Med. Dep't*, 25 F. Supp. 3d 1361, 1366 (N.D. Ala. 2014), *aff'd*, 591 Fed. Appx. 908 (11th Cir. 2015) (quoting 42 U.S.C. § 12102(3)(A)) (internal ellipsis omitted).  In the ADA Amendments Act of 2008, Congress expanded the "regarded as" prong of the definition of disability so that a person now may be regarded as having an

---

[10] JCSO does not contend that Mr. Lowe was not qualified to work as a deputy sheriff.

impairment "whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3). The Eleventh Circuit has held that under the ADA Amendments Act of 2008, "an extensive analysis is not required to determine whether an individual's impairment is a disability under the ADA." *St. Joseph's Hospital*, 842 F.3d at 1343 (citing *Mazzeo v. Color Resolutions Intern., LLC*, 746 F.3d 1264, 1268 (11th Cir. 2014)).

The United States Supreme Court has explained that a physical or mental impairment may include emotional illness and alcoholism. *Bragdon v. Abbott*, 524 U.S. 624, 632-33 (1998). PTSD "is not included in the list of specific disorders" that the Supreme Court examined in *Bragdon*, but the condition "does fall well within the general definition set forth by" regulations interpreting the Rehabilitation Act which the Supreme Court used in *Bragdon* to identify disabling impairments under the ADA. *Bragdon*, 524 U.S. at 633. According to the American Psychiatric Association, Posttraumatic Stress Disorder or PTSD is a:

> psychiatric disorder that may occur in people who have experienced or witnessed a traumatic event, series of events or set of circumstances. . . . Examples include . . . war/combat . . . PTSD has been known by many names in the past, such as "shell shock" during the years of World War I and "combat fatigue" after World War II, but PTSD does not just happen to combat veterans. . . . People with PTSD have intense, disturbing thoughts and feelings related to their experience that last long after the traumatic event has ended. They may relive the event through flashbacks or nightmares . . .

*What is Posttraumatic Stress Disorder (PTSD)?*, Am. Psychiatric Ass'n, https://www.psychiatry.org/patients-families/ptsd/what-is-ptsd (last visited Mar. 2, 2023).

Thus, PTSD is a mental health impairment. It is undisputed that PTSD limited Mr. Lowe's ability to sleep. In *Rossbach v. City of Miami*, the Eleventh Circuit Court of Appeals recognized that sleep is a major life activity. 371 F.3d 1354, 1357 (11th Cir. 2004). The Court of Appeals explained:

> The regulations interpreting the Rehabilitation Act of 1973 define major life activities as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 45 C.F.R. § 84.3(j)(2)(ii). If not contained within these exemplars, the activity must be "significant" to everyday life. *Bragdon,* 524 U.S. at 638, 118 S.Ct. 2196. Several courts, for example, have found that sleeping constitutes a major life activity.

*Rossbach*, 371 F.3d at 1357. The evidence, viewed in the light most favorable to Mr. Lowe, indicates that PTSD substantially limited his ability to sleep at night, so much so that he asked to transfer to a late shift because he slept better during the day. (Doc. 30-4, pp. 10, 19).[11] Thus, Mr. Lowe can establish that he has a mental impairment that substantially limits one or more of his major life activities.

---

[11] *See* 29 C.F.R. § 1630.2(j)(1)(i) ("The term 'substantially limits' shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA. 'Substantially limits' is not meant to be a demanding standard."). Mr. Lowe did not have a formal PTSD diagnosis when he requested transfer to a late shift, but a plaintiff "need not obtain a formal diagnosis to receive coverage under the ADA. *See* 42 U.S.C. § 12101(1). Rather, the question is whether at the time of the adverse employment action [the plaintiff] had a 'physical or mental impairment that substantially limit[ed] one or more major life activities.' *Id.*" *Polasek v. Office of State's Attorney of Cook County*, 2022 WL 17718412, *5 (N. D. Ill. Dec. 14, 2022).

Additionally, reasonable jurors could conclude that the JCSO regarded Mr. Lowe as disabled by a mental impairment.  Approximately two weeks after the JCSO granted Mr. Lowe's request to move from Patrol to Corrections, Mr. Lowe's immediate supervisor, Sgt. Scott, wrote a memo to Lt. Guntharp in which he recommended that Lt. Guntharp reassign Dep. Lowe to nightshift "not only as a way to ensure he is able to gain the sleep he needs but to also ensure the safety of those assigned to work with him as he should be well rested and not sleep deprived." (Doc. 30-4, pp. 10, 19).  Two days later, Mr. Lowe wrote a letter to Lt. Guntharp in which he explained that, as a consequence of events that occurred while he served in the Marines, he had "difficulty sleeping at night" and was seeking help from a mental health professional through the V.A. Hospital.  (Doc. 35-3, p. 2).  A few days later, after he transferred Mr. Lowe to the evening shift, Lt. Guntharp asked Captain Thompson for permission to send Mr. Lowe "for a drug urinalysis test when he shows up for work" and to require Mr. Lowe "to either contact Employee Assistance for counseling or provide proof of counseling from the Veteran's Hospital."  (Doc. 35-2, p. 3).  Thus, Mr. Lowe has presented sufficient evidence to establish the first prong of his *prima facie* case of ADA discrimination.

*Reasonable Accommodation*

For the reasonable accommodation prong of his discrimination claim, Mr. Lowe must demonstrate that he identified an accommodation that was reasonable.

*Frazier-White v. Gee*, 818 F.3d 1249, 1255-56 (11th Cir. 2016). In some circumstances, an employer may "need to 'initiate an informal, interactive process' with a disabled employee to determine the appropriate reasonable accommodation. 29 C.F.R. § 1630.2(*o*)(3)." *Frazier-White*, 818 F.3d at 1257.

The Eleventh Circuit recently provided criteria for district courts to use when examining a request for accommodation. The Eleventh Circuit stated that an employee must identify his disability and "provide at least some information about how a physical or mental condition limits [his] functioning." *Owens v. Governor's Office of Student Achievement*, 52 F.4th 1327, 1334-35 (11th Cir. 2022).[12] In other words, "an employee must identify—at least in broad strokes—the limitations [his] mental or physical condition imposes." *Owens*, 52 F.4th at 1335. The employee also must provide information that allows his employer to assess how a "proposed accommodation would help [him] overcome [his] disability's limitations." *Owens*, 52 F.4th at 1335.

"The type and extent of information that an employee must provide will depend, of course, on the particulars of each case. The link between the disability and the requested accommodation may often be obvious." *Owens*, 52 F.4th at 1335-36. "An employee's informational burden" is "modest." *Owens*, 52 F.4th at 1336.

---

[12] *Owens* is a Rehabilitation Act case. The Eleventh Circuit has held that the legal standards for employment discrimination cases under the Rehabilitation Act and the ADA are the same. *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) ("[C]ases involving the ADA are precedent for those involving the Rehabilitation Act.").

An employee does not have to provide his employer "with detailed or private information about [his] disability to initiate the employer's duty to engage in an interactive assessment about the need for an accommodation." *Owens*, 52 F.4th at 1336. "Rather, to trigger an employer's accommodation duties, a disabled employee need only identify a statutory disability and explain generally how a particular accommodation would assist" him. *Owens*, 52 F.4th at 1336.

"[W]hen an employee triggers an employer's accommodation duties, the employer must expend time and expense to explore the universe of reasonable accommodations, identify one that is mutually agreeable to the parties, and implement it." *Owens*, 52 F.4th at 1335.

Viewed in the light most favorable to Mr. Lowe, the evidence demonstrates that he gave JCSO notice of two disabling conditions, PTSD and alcoholism. In January 2019, Mr. Lowe told his immediate supervisor, Sgt. Scott, that he was having trouble waking up in the mornings because nightmares concerning his service in the Marines awoke him during the night. Mr. Lowe provided the same information to Lt. Guntharp and indicated that he was seeking mental health treatment to address the nightmares. Mr. Lowe did not label his disability "PTSD," but he was in the process of seeking treatment that ultimately provided the needed label. JCSO apparently thought Mr. Lowe had a legitimate need for help because Lt. Guntharp approved Mr. Lowe's requested accommodation of a transfer to

evening shift.  Lt. Guntharp's February 1, 2019 memo to Cpt. Thompson illustrates Lt. Guntharp's understanding that there was a mental health component to the nightmares that Mr. Lowe reported; Lt. Guntharp wrote:  "I would like to recommend that Deputy Lowe be required to either contact Employee Assistance for counseling or provide proof of counseling from the Veteran's Hospital."  (Doc. 35-2, p. 3).

Two weeks after JCSO accommodated Mr. Lowe's first disabling impairment, Mr. Lowe called Lt. Guntharp at home at night, reported that he had a substance abuse issue that was affecting his work, and asked for help.  (Doc. 30-1, p. 15, tp. 51; *see* Doc. 35-6, p. 65, tpp. 246-47).  Lt. Guntharp acknowledged under oath that Mr. Lowe "apparently" talked to him about going into rehab during that call.  (Doc. 35-6, pp. 95-96, tpp. 369-70).  Lt. Guntharp instructed Mr. Lowe to contact Employee Assistance, and Mr. Lowe did so immediately.[13]  Mr. Lowe reported his

---

[13] Mr. Lowe called Lt. Guntharp at home at 8:01 p.m. and spoke to him for nearly four minutes. (Doc. 35-6, pp. 6, 95, tpp. 10, 367-69, 371).  According to Mr. Lowe, during the call, he told Lt. Guntharp that he (Mr. Lowe) "had a substance abuse issue that was affecting [his] work ability," and he told Lt. Guntharp that he "needed help."  (Doc. 30-1, p. 15, tp. 51; *see also* Doc. 35-6, pp. 65, 249, tpp. 246-47, 985).  When pressed, Lt. Guntharp acknowledged that he "apparently" spoke to Mr. Lowe about his need for rehab during that call.  (Doc. 35-6, pp. 95-96, tpp. 369-70).  Lt. Guntharp was confident that he and Mr. Lowe discussed Employee Assistance during the call. (Doc. 35-6, p. 95, tpp. 366-67).

In their summary judgment submissions, the parties provided minimal information about the employee assistance program to which the parties referred in depositions and hearings.  (Doc. 30-3, p. 30).  According to documents available on the internet, the Jefferson County Commission offers to all county employees an "Integrated Employee Assistance Program" for mental health and substance abuse.  The services are provided through Behavioral Health Systems, Inc. *Integrated Employee Assistance Program, Mental Health, And Substance Abuse Benefits*, BHS,

substance abuse to the Employee Assistance doctor, and that doctor sent Mr. Lowe directly to Bradford for residential treatment.  Reasonable jurors could infer that the EAP physician recognized that Mr. Lowe was in crisis and needed immediate treatment.  (Doc. 35-6, pp. 64, 247-48, tpp. 244, 975-76, 979).[14]  On the particulars of this case, jurors could conclude that Mr. Lowe's supervising officers understood that he needed mental health and substance abuse treatment.[15]

---

https://www.jccal.org/Sites/Jefferson_County/Documents/Human%20Resources/BHS-JCC MENTAL-HEALTH-Benefit-Summary.pdf (last visited Mar. 3, 2023).  The "Wellness" page of the Jefferson County Commission's website provides:  "BHS offers counseling for a wide range of emotional issues, including, substance abuse and many other mental health-related issues. To find out more about covered conditions and the different treatment options available, call 800-245-1150.  Services are covered if you are a member of the Jefferson County Commission Group Health Plan, if not a member of the health plan; please take advantage of One Free initial assessment available to ALL County employees through the Employee Assistance Program (EAP)."  *Wellness*, JEFFERSON CNTY. ALA., https://www.jccal.org/Default.asp?ID=1227&pg=Wellness (last visited Mar. 3, 2023).

The Court takes judicial notice of these reliable sources of information from the Jefferson County website.  *See Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1278-79 (11th Cir. 1999) ("Fed.R.Evid. 201(b) provides for taking judicial notice of facts that are not subject to reasonable dispute because they are capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.  When SEC documents are relevant only to determine what statements or disclosures are actually contained therein, there can be little question as to authenticity, nor can the fact that such statements or disclosures were thus publicly filed be reasonably questioned."); *Universal Express, Inc. v. U.S. S.E.C.*, 177 Fed. Appx. 52, 53-54 (11th Cir. 2006) (holding that a "district court may take judicial notice of certain facts without converting a motion to dismiss into a motion for summary judgment.  Public records are among the permissible facts that a district court may consider.") (citations omitted).

Lt. Guntharp's instruction to Mr. Lowe to call Employee Assistance is evidence that he understood that Mr. Lowe had a substance abuse and/or mental health illness.

[14] Mr. Lowe explained that he was having thoughts of suicide.  (Doc. 35-6, p. 249, tp. 985).

[15] It is widely-recognized that among military veterans, PTSD and substance abuse go hand-in-hand.  According to the Department of Veterans Affairs, "[s]ome people try to cope with PTSD symptoms by using drugs or alcohol. PTSD and substance abuse, like drinking too much or using drugs, are related. . . . More than 2 of 10 Veterans with PTSD also have [Substance Use Disorder

Before he entered Bradford, Mr. Lowe did not request a more specific accommodation to address his substance abuse, but under *Owens*, he did not have to offer more details to meet his modest burden.  The link between substance abuse and rehab is obvious.  Moreover, Mr. Lowe did not have an opportunity to request a particular accommodation for rehab before he entered treatment because his calls to JCSO on his way to Bradford were not answered.  He could not make calls while he was in treatment at Bradford.  (Doc. 30-1, p. 22, tpp. 79-80; Doc. 35-6, pp. 250, tp. 987).  Before he was released from Bradford, JCSO terminated him even though Mr. Lowe's supervisors knew that he was hospitalized.  When he was released from Bradford, with the help of an attorney, Mr. Lowe scheduled a meeting with JCSO to discuss the termination, but Sheriff Pettway canceled the meeting before Mr. Lowe could provide additional information about his hospitalization or discuss accommodations.  (Doc. 30-1, p. 21, tp. 77; Doc. 35-6, p. 252, tp. 995).

On this record, a jury must determine whether JCSO was obligated to "explore the universe of reasonable accommodations, identify one that [was] mutually agreeable to the parties, and implement it."  *Owens*, 52 F.4th at 1336.  Reasonable jurors could conclude that JCSO breached its obligation.  After referring Mr. Lowe to IEP on February 18, 2019, Lt. Guntharp did not follow up with Mr. Lowe because

---

or SUD].  Almost 1 out of every 3 Veterans seeking treatment for SUD also has PTSD." *PTSD and Substance Abuse in Veterans*, U.S. DEP'T VETERANS AFFS., https://www.ptsd.va.gov/understand/related/substance_abuse_vet.asp (last visited Mar. 4, 2023).

he was "[b]usy with other things."  (Doc. 35-6, p. 96, tp. 373).  But Lt. Guntharp found time on February 21, 2019 to recommend to Captain Thompson that JCSO give Mr. Lowe a three-day suspension without pay and require a "fitness for duty examination (mental)."  (Doc. 35-1, p. 3).  In the written report to Captain Thompson, Lt. Guntharp did not mention his conversation with Mr. Lowe three days earlier in which Mr. Lowe reported his substance abuse problem and requested help or his directive to Mr. Lowe to contact EAP.  Again, as soon as he was able to meet in person, Mr. Lowe and his attorney contacted JCSO and scheduled a meeting to explain Mr. Lowe's situation and address his termination while he was hospitalized, but Sheriff Pettway cancelled the meeting.

Sheriff Pettway contends that he did not receive documentation substantiating Mr. Lowe's meeting with EAP or Mr. Lowe's hospitalization at Bradford until the April 12, 2019 Loudermill hearing regarding Mr. Lowe's termination.  (Doc. 30-2, p. 24).  If Sheriff Pettway had not cancelled the April 1, 2019 meeting with Mr. Lowe and his attorney, he could have learned more about Mr. Lowe's disabilities and the accommodations he needed, and he would have received documentation regarding Mr. Lowe's February 25, 2019 EAP meeting with the JeffCo physician and Mr. Lowe's hospitalization sooner.  Moreover, Sheriff Pettway could have considered the documents that Mr. Lowe provided on April 12, 2019 and discussed options for accommodation then, but he didn't.  On this record, jurors could conclude

33

that the Sheriff breached his obligation to engage in the interactive process with Mr. Lowe.

*Pretext*

Mr. Lowe's pretext evidence begins with Lt. Guntharp's conduct.  The record demonstrates that three days after Mr. Lowe reported to Lt. Guntharp that he was struggling with combat-related nightmares that made it difficult for him to sleep, (Doc. 35-3, p. 2), Lt. Guntharp reported to Captain Thomas four dates on which Mr. Lowe was late to work and the date of one absence, and recommended that Mr. Lowe receive a three-day suspension without pay.  (Doc. 35-2).  Lt. Guntharp did not include in his report information about Mr. Lowe's nightmares or the fact that Mr. Lowe was seeking mental health treatment to manage the nightmares.

Three days after Mr. Lowe reported his substance abuse to Lt. Guntharp and asked for help getting treatment, Lt. Guntharp reached out to Captain Thompson again and recommended that Mr. Lowe receive a three-day suspension without pay and that Mr. Lowe be ordered to take a fitness for duty mental examination.  (Doc. 35-1).  Lt. Guntharp reminded Captain Thompson of Mr. Lowe's prior late arrivals and added a second absence to the report.  This time, Lt. Guntharp notified Captain Thomas that Mr. Lowe had disclosed his "difficulty sleeping due to his military experience many years ago," but Lt. Guntharp did not mention Mr. Lowe's report of substance abuse, and Lt. Guntharp did not report that he had directed Mr. Lowe to

contact Employee Assistance.  Captain Thomas approved the suspension.  (Doc. 35-1, p. 2).

Sheriff Pettway testified that he spoke to Lt. Guntharp about Mr. Lowe before Mr. Lowe's termination; that Lt. Guntharp had a lot to say about Mr. Lowe, though Sheriff Pettway could not recall details; and that Lt. Guntharp reported that "he had tried to reach out to Jacob Lowe [to offer] help and Jacob Lowe denied that he needed help."  (Doc. 35-7, pp. 10, 11, tpp. 36-38; *see also* Doc. 35-7, p. 14, tp. 40).  Sheriff Pettway stated that he did not know that Mr. Lowe reported to Lt. Guntharp the nightmares he was experiencing about his time in combat or that Mr. Lowe informed Lt. Guntharp that he was seeking treatment from the VA Hospital.  (Doc. 35-7, pp. 10-11, tpp. 36-38).  According to Sheriff Pettway, though he could not recall everything that Lt. Guntharp told him about Mr. Lowe, Lt. Guntharp did not disclose that Mr. Lowe had reported his substance abuse and asked for help, and Lt. Guntharp did not disclose that he had referred Mr. Lowe to EAP.  In March of 2022, Sheriff Pettway testified:  "If [Lt. Guntharp] referred [Mr. Lowe], [Mr. Lowe] didn't go to EAP."  (Doc. 35-7, pp. 2, 13, tpp. 1, 45).  Sheriff Pettway added:  "If [Mr. Lowe] would have come and asked for help before he went AWOL, we would have been glad to get him help and assistance of whatever problems that he had."  (Doc. 35-7, p. 15, tp. 53).

Viewing the circumstantial evidence in its entirety, reasonable jurors could

choose to disbelieve Sheriff Pettway's statement that his office would have been glad to help Mr. Lowe if he had asked for help.  The evidence indicates that Mr. Lowe asked for help, and, at Lt. Guntharp's direction, Mr. Lowe went to EAP to get help, a fact that Sheriff Pettway knew – or at least should have known -- long before March of 2022.[16]  Because Sheriff Pettway's statement that Mr. Lowe did not go to EAP cannot be reconciled with the objective evidence that Mr. Lowe did, in fact, go to EAP at Lt. Guntharp's direction, Sheriff Pettway's assertion to the contrary undermines the credibility of his other statements regarding what he did and did not know about Mr. Lowe's PTSD and substance abuse before he decided to terminate Mr. Lowe.  Reasonable jurors could conclude that when Mr. Lowe disclosed to Lt. Guntharp information about two disabilities that explained his struggles with late arrivals and absences, Lt. Guntharp began a campaign for disciplinary action against Mr. Lowe and recommended a fitness for duty assessment that might imperil Mr. Lowe's job as a deputy sheriff.  Jurors could conclude that when Sheriff Pettway

---

[16] Sheriff Pettway attended the final administrative hearing regarding Mr. Lowe's termination. (Doc. 35-6, p. 4, tp. 3).  That hearing took place over several days between July 16, 2019 and September 19, 2019.  (Doc. 35-6, p. 3).  There was extensive testimony during the hearing regarding Mr. Lowe's conversation with Lt. Guntharp regarding his substance abuse and his need for rehab, Lt. Guntharp's instruction to Mr. Lowe to contact EAP, and Mr. Lowe's two trips to EAP, all in February of 2019.  Sheriff Pettway acknowledged that Mr. Lowe's wife reported that he was hospitalized at Bradford, but Sheriff Pettway did not contact Mr. Lowe's wife to get additional information about the hospitalization.  Sheriff Pettway did not speak to Mr. Lowe after he was released from Bradford because, Sheriff Pettway testified, Mr. Lowe "was not available" at any time before Sheriff Pettway terminated his employment.  Sheriff Pettway stated that Mr. Lowe was not available for a conversation about his hospitalization on the day of the meeting that Sheriff Pettway and his attorney cancelled.  (Doc. 35-6, p. 194, tpp. 762-64).

learned of Mr. Lowe's hospitalization at Bradford, Sheriff Pettway actively avoided information that might cause him to have to explore accommodations for Mr. Lowe.

In deciding whether Mr. Lowe's termination was motivated by discriminatory intent, jurors may consider the fact that the termination notice that Chief Deputy Hill signed on March 4, 2019, contained inaccurate information.  Chief Deputy Hill stated that Mr. Lowe had been "written up" for policy violations five times since his transfer on January 10 to Corrections and had been AWOL since February 20.  (Doc. 30-4, pp. 25-26).  The assertion that Mr. Lowe had been AWOL since February 20 is inconsistent with Mr. Lowe's testimony that he had permission from his supervisor, Sgt. Posey, to attend an EAP appointment on February 22, 2019, and he reported to work after the meeting.  Sgt. Posey also gave Mr. Lowe permission to attend a second EAP appointment on February 25, 2019.  (Doc. 30-4, p. 4, ¶ 13; Doc. 35-6, pp. 65, 67, tpp. 248-49, 254-56).  Mr. Lowe left that appointment, and, at the direction of a JeffCo physician, reported directly to Bradford.  Jurors also may consider the fact that the March 4, 2019 termination notice violated JCSO policy because the notice did not provide information about steps Mr. Lowe could take to challenge the termination.  (Doc. 35-6, p. 252, tpp. 994-95).[17]  A letter from the

---

[17] In December of 2018, while Mike Hale was the Sheriff of Jefferson County, Mr. Lowe received a Notice of Contemplated Disciplinary action in which then-Chief Deputy Christian advised Mr. Lowe that he had recommended that the JCSO suspend Mr. Lowe for five days without pay.  The notice states that Mr. Lowe had the right to appeal the recommendation within 10 days.  (Doc. 30-2, pp. 16-17).

Jefferson County Pension Board stating that Mr. Lowe was terminated effective March 4, 2019, could support a reasonable inference that JCSO did not intend to allow Mr. Lowe to appeal his termination.  (Doc. 35-6, pp. 31,143, 250-51, tp. 113, 560-61, 993-94).  Sheriff Pettway's refusal to meet with Mr. Lowe after Mr. Lowe completed his hospitalization at Bradford would support this inference and demonstrates Sheriff Pettway's willful avoidance of information that might cause him to have to discuss accommodations with Mr. Lowe.[18]

Because the evidence viewed in the light most favorable to Mr. Lowe indicates that he had qualifying disabilities, that JCSO breached its obligation to engage in the interactive process with him, and that the stated reason for Mr. Lowe's termination is pretext for discrimination based on Mr. Lowe's PTSD and substance abuse disorder, the Court will deny Sheriff Pettway's motion for summary judgment on Mr. Lowe's ADA discrimination claim.

*Retaliation*

Mr. Lowe contends that he was fired in retaliation for engaging in activity protected by the ADA.  He argues that he "engaged in a protected activity by seeking

---

[18] Stated differently, before Sheriff Pettway made the final decision to terminate Mr. Lowe, Sheriff Pettway had the means and the opportunity to determine whether Mr. Lowe reported his health concerns to his superior officers, went to EAP at the direction of his superior officers, and was hospitalized for mental health and substance abuse treatment at the direction of an EAP physician. Reasonable jurors could conclude that as the final decisionmaker, Sheriff Pettway turned a blind eye to information that may have caused his office to have to accommodate Mr. Lowe's substance abuse and mental health treatment.

assistance with alcohol addiction through EAP and enrolling in treatment at Bradford [Health Services] in February 2019." (Doc. 35, p. 13).

To prevail on an ADA retaliation claim, a plaintiff "must show that: (1) []he engaged in a statutorily protected expression, (2) []he suffered an adverse employment action, and (3) there was a causal link between the two." *Frazier-White*, 818 F.3d at 1258. Requesting a reasonable accommodation for a disability is a "statutorily protected expression." *Hughes v. Wal-Mart Stores East, LP*, 846 Fed. Appx. 854, 858 (11th Cir. 2021) (citing *Frazier-White*, 818 F.3d at 1258). The causation element requires "that the desire to retaliate was the but-for cause of the challenged employment action." *Hughes*, 846 Fed. Appx. at 858 (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013)). The Supreme Court has held that, "[o]ften, events have multiple but-for causes." *Bostock v. Clayton County, Ga.*, 140 S. Ct. 1731, 1739 (2020). Thus, Mr. Lowe's ability to present his ADA discrimination claim to a jury does not preclude a trial of his ADA retaliation claim if the parties' evidence regarding that claim is in conflict.

Here, Mr. Lowe was fired shortly after he engaged in statutorily protected expression. From the evidence discussed at length regarding Mr. Lowe's ADA discrimination claim, reasonable jurors could conclude that Mr. Lowe's request for accommodations for his PTSD and substance abuse caused Sheriff Pettway to fire him. Therefore, the Court will deny Sheriff Pettway's motion for summary

judgment on Mr. Lowe's ADA retaliation claim.

## 42 U.S.C. § 1983 Due Process Claim

Mr. Lowe appears to have abandoned his § 1983 due process claim.  In his summary judgment brief, Sheriff Pettway asserted a variety of arguments against Mr. Lowe's § 1983 claim on the merits and on grounds of qualified immunity.  (Doc. 32, pp. 23-26).  Mr. Lowe did not address those arguments in his opposition brief.

The Fourteenth Amendment guarantees that no state shall "deprive any person of life, liberty, or property, without due process of law."  U.S. CONST. amend. XIV. An individual deprived of due process may bring a cause of action under 42 U.S.C. § 1983.  "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'"  *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)).  The record demonstrates that although JCSO's March 4, 2019 termination notice was deficient because it did not advise Mr. Lowe of his opportunity to challenge the grounds for termination provided in the notice, JCSO issued a substitute notice in April 2019 that included appeal information.  JCSO held a determination hearing before JCSO finalized Mr. Lowe's termination.

Because Mr. Lowe has offered no evidence to create a factual dispute for a jury to resolve with respect to his § 1983 due process claim, the Court will enter judgment for Sheriff Pettway on that claim.

## V.

For the reasons stated above, the Court enters judgment in favor of Chief Deputy Hill on Mr. Lowe's claims against him.  The Court enters judgment for Sheriff Pettway on Mr. Lowe's Title VII and § 1983 due process claims.  The Court also enters summary judgment in favor of Sheriff Pettway on Mr. Lowe's ADA discrimination and retaliation individual capacity claims.  The Court denies Sheriff Pettway's motion for summary judgment on Mr. Lowe's official capacity ADA discrimination and retaliation claims.  By separate order, the Court will set those claims for trial.

**DONE** and **ORDERED** this March 28, 2023.

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE

41